UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE THE SEARCHES OF: ) | |
| ) | |
| 400 McKean Avenue, Apt. 1 (side apt) ) | Magistrate No. 18 . 528M |
| Donora, PA 15033 ) | |
| ) | |
| 815 Washington Avenue, Charleroi, PA ) | Magistrate No. 18 . 529M |
| 15022 ) | |
| ) | |

## AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT

### INTRODUCTION

I, Terrence R. Sweeney, Special Agent, Federal Bureau of Investigation, United States Department of Justice, being duly sworn, state as follows:

1. I am an "Investigative or Law Enforcement Officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2. I am a Special Agent ("SA") of the United States Department of Justice, Federal Bureau of Investigation ("FBI"), and have been so employed for twenty-one (21) years. Since March of 2008, I have been assigned to the Mon Valley Resident Agency of the FBI's Pittsburgh Division. During my time with the FBI, I have been assigned to investigative units dealing with organized crime, drug trafficking, gangs, and violent crimes. During my training at the FBI Academy in Quantico, Virginia, I received extensive training in a variety of investigative and legal matters, including the topics of Fourth Amendment searches and the constitutional requirements for the interception of telephone communications.

1

3. I have been involved in many narcotics-related arrests and the service of many narcotics-related search warrants. I have handled cooperating sources of information who were involved in narcotics acquisition and/or trafficking. In addition, I have reviewed thousands of communications between drug traffickers as a result of my participation in multiple wiretap investigations. As a result of my narcotics-related training and experience, I am familiar with the methods and language used to distribute narcotics, to launder proceeds, and to operate drug-trafficking conspiracies.

4. I have experience conducting surveillance, analyzing telephone records, interviewing witnesses, executing search and arrest warrants, and other investigative techniques. The investigations in which I have participated have resulted in the arrest and prosecution of individuals who have smuggled, received, and distributed controlled substances, including heroin and cocaine. I have participated in several investigations in which court-authorized wire and electronic interceptions were utilized. I have provided trial testimony in federal court, subject to cross-examination, about how such wiretap investigations are conducted.

5. Based on my training and experience, I am aware that it is common practice for drug traffickers who desire to insulate themselves from detection by law enforcement to routinely utilize multiple telephones, counter surveillance, false or fictitious identities, and coded communications to communicate with their customers, suppliers, couriers, and other conspirators. It is not unusual for drug traffickers to initiate or subscribe such phone or phone device services under the names of other real or fictitious people. Moreover, it is now a very common practice for drug traffickers to utilize all communication features of their telephones, most notably the voice call and text message features, nearly simultaneously to communicate with their conspirators.

6. I am currently participating in the investigation of the LIGHTFOOT Drug Trafficking Organization (referred to herein as "the LIGHTFOOT DTO"), a drug trafficking organization operating in and around Washington, Fayette, Westmoreland and Allegheny Counties, in the Western District of Pennsylvania. Members of the Organization are engaged in federal felony offenses including violations of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846, and Title 18, United States Code, Sections 1956 and 1957.

7. This investigation is being conducted by Special Agents and Officers of the FBI, the Pennsylvania State Police, the Perryopolis Police Department, South Strabane Police Department, and local law enforcement, among other agencies. I have obtained the information contained in this affidavit from my personal participation in this investigation and from reviewing information obtained by other law enforcement officers, as well as information provided by confidential sources.

8. This affidavit is submitted in support of search warrants for the following **TARGET LOCATIONS**, further detailed in Attachment A, **TARGET LOCATION A, 400 McKeen Avenue, Apt. 1 (side apt), Donora, PA 15033, and TARGET LOCATION B, 815 Washington Avenue, Charleroi, PA 15022.**

9. As explained herein, there is probable cause to conclude that, from in or around April 25, 2018, there are quantities of controlled substances, in violation of Title 21, United States Code, Section 841 and 846; and (2) that evidence of that crime as listed in Attachment B, is located at or inside the **TARGET LOCATIONS**. Because this affidavit is being submitted for the limited purpose of supporting the search and seizure warrant as stated herein, I have not included each and every fact known to me concerning this investigation.

## EVIDENCE COMMONLY GENERATED BY DRUG TRAFFICKING

10. I am aware that the following kinds of evidence have been recovered in a substantial number of searches executed in connection with drug trafficking and money laundering investigations and that there is probable cause to conclude that such evidence is located at or inside the locations and vehicles to be searched/seized:

1) controlled substances, such as cocaine, and heroin;

2) paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, "stamp bags", microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

3) books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, relating to travel for the purpose of acquiring and/or distributing controlled substances, and relating to monetary transactions involving the proceeds from the sale of controlled substances;

4) personal books, papers, cell phones, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

5) cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and

4

precious gems such as diamonds, the possession of which, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

6) documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

7) computers, cellular telephones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists), and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

8) firearms and other dangerous weapons; and

9) identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

11. Based upon my training and experience, as well as the collective knowledge and experience of other agents and officers associated with this investigation, I am aware that it is generally a common practice for drug traffickers to store their drug inventory, drug paraphernalia, drug proceeds, and drug records (as described above) at or in their residences (including garages and outbuildings), businesses, and vehicles, or at or in the residences, businesses, and vehicles of relatives or other trusted associates. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, and/or will be "fronted" controlled substances from their suppliers, record keeping is necessary to keep track of amounts paid and owed, and such records will be maintained close at hand so as to readily ascertain current balances and to keep track of how proceeds are being expended. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the traffickers' suppliers and the traffickers' dealers. Additionally, drug traffickers must maintain telephone listings of clients and suppliers to efficiently conduct their drug trafficking business. Such listings are frequently kept inside their cell phones.

12. Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and must keep these telephones in their actual (on their persons) or constructive (in their vehicles, residences, and businesses) possession to have ready access to them. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones

have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

13. It is also a generally common practice for traffickers to conceal inside their residences or businesses or vehicles (particularly if they have a trap/hidden compartment), or inside the residences or businesses or vehicles of relatives or trusted associates, large sums of money, either the proceeds from drug sales or moneys to be used to purchase controlled substances. Drug traffickers often make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking and money laundering would also typically be maintained in the residences, businesses, or vehicles of those involved in selling drugs or their relatives or trusted associates.

14. Drug traffickers often possess firearms, ammunition, and other dangerous weapons to protect their proceeds, product, and person from others who might attempt to rob them, and to enforce payment from their customers. Drug traffickers do not typically call the police when they are robbed of their drugs or drug proceeds and they do not typically file lawsuits to recover unpaid drug debts. As a result, it is common for drug traffickers to arm themselves instead of calling the police or seeking legal recourse. And because their drug trafficking activities are conducted over an extended period of time, drug traffickers possess firearms, ammunition, and other dangerous weapons for extended periods of time in convenient and safe locations such as their residences, businesses, and vehicles.

15. When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement. In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and

residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found either inside the residence, business, or vehicle of the drug trafficker or inside the residence, business, or vehicle of the person in whose name the asset is listed.

16. I am aware that drug traffickers sometimes take trophy photographs of their drugs, drug proceeds, and firearms and retain the photographs in their residences or on their computers, cell phones, cameras, or other electronic storage devices. I am also aware that drug traffickers, like law-abiding citizens, sometimes take photographs of themselves with their friends, relatives, and associates and keep the photographs in their residences. When they are taken or retained by drug traffickers, such photographs can be evidence, or can lead to evidence, of drug trafficking and money laundering by identifying closely associated people who are actively assisting and/or supporting the drug trafficking activity.

17. Drug traffickers often operate under assumed names to conceal their true identities from law enforcement officers. In so doing, they acquire property, services, and personal identification items (such as driver's licenses and birth certificates) under their assumed or alias names. They maintain such items, as well as records relating to such items, in their residences, businesses, and vehicles, together with evidence of their true identities.

18. Drug traffickers commonly conceal their activities from members of the public by transacting their business in a covert manner and/or during the nighttime hours when darkness helps to conceal their activities. In addition, large-scale drug traffickers often have multiple locations (including businesses, residences, and/or "stash houses") from which they operate their illegal activities and in which they maintain evidence of said illegal activities. Finally, it has

become much more common for drug traffickers to utilize computers, cellular telephones, and/or other electronic media for communication and data-acquisition and data-retention purposes. It is now not uncommon for drug traffickers to have email accounts or various apps for cell phones that facilitate communications as well as the acquisition and expenditure of drug trafficking proceeds.

19. Evidence of drug crimes can be found in the cell phones/computers/electronic media referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails or instant messages. It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones. In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

20. As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally.

21. Traces of the path of an electronic communication or of an internet search may be

automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

22. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

23. Based on my training and experience, I know that heroin and cocaine are not cultivated or manufactured within or anywhere near the Western District of Pennsylvania. Cocaine

is typically transported interstate in kilogram quantities. It is thereafter sold in the Western District of Pennsylvania in either kilogram quantities (with a value in excess of $40,000 each) or in smaller quantities such as by the ounce (there are about 36 ounces in a kilogram). Cocaine, as well as heroin, is often cut (i.e., mixed) with other substances to increase its volume and to allow dealers to make more money.

24.     I know that heroin is generally brought into the Western District of Pennsylvania in the following two ways: either in bulk quantities, often referred to as "raw", and then broken down into smaller quantities upon arrival; or the heroin is already packaged in bags, known as "stamp bags", which are usually the size of a postage stamp holder. A brick is the common distribution quantity of heroin between heroin dealers. The wholesale value of a brick in the Pittsburgh area currently ranges from over $200 to over $500 depending on the volume purchased. A brick generally contains 1 to 2 grams of heroin in 50 stamp bags organized into 5 bundles of 10 stamp bags. Each bag is often stamped with text or a symbol representing the "brand" of heroin. The stamp is designed to generate consumer loyalty. Heroin is used by the bag. The retail value of a brick of heroin that is sold by the bundle or by the bag can exceed $500.

25.     My awareness of these drug trafficking practices, as well as my knowledge of drug use/distribution and money laundering techniques as set forth in this affidavit, arise from, among other things, the following: a) my own involvement in this and prior drug investigations and searches during my career, as previously described; b) my involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents and police officers have advised me of when relating the substance of their similar debriefings and the results of their own drug investigations; c) discussions with other federal, state, and local law enforcement officers, both about the facts of this case in particular and

11

about trafficking in general; and d) review of thousands of intercepted telephone communications between drug traffickers during which the traffickers have discussed the topics referenced herein.

26. In addition, as a result of conversations with Assistant United States Attorneys, I am aware that courts have recognized that, with respect to drug dealers, evidence of their involvement in the drug trade is likely to be found in places with a nexus to their crimes, including both the locations where the dealers reside and other locations to which they and their co-conspirators have access, even if no drug trafficking was directly observed to occur there. Even without direct observation of drug trafficking in these locations, a nexus may be inferred and established based upon "the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide . . . [evidence]." *United States v. Stearn*, 597 F.3d 540, 558 (3d Cir. 2010) (citation and quotation marks omitted).
belief.

## PROBABLE CAUSE

27. On April 24, 2018, a federal grand jury in the Western District of Pennsylvania, returned a thirteen count superseding indictment at Criminal Number 17-328. Target subjects, **Malik LAWSON** and **Anthony CREWS** were charged in Count 1 of that indictment with conspiracy to possess with the intent to distribute and distribute 5 kilograms or more of cocaine. On the same date, the Honorable Maureen Kelly, Chief Magistrate Judge signed arrest warrants for **LAWSON** and **CREWS.**

28. In the early morning on April 25, 2018, investigators with the FBI and various local and state agencies went to serve the arrest warrants for **LAWSON** and **CREWS** at **TARGET LOCATION A** and **TARGET LOCATION B,** respectively.

29. At approximately 6:00 a.m., on April 25, 2018, investigators went to make contact

with **LAWSON** at **TARGET LOCATION A. LAWSON** answered the door at the location and let investigators into the house in order to effectuate the arrest. Throughout the house, there was a strong odor of marijuana that investigators noticed immediately upon entry. Investigators then went to sweep and secure the house as **LAWSON** told them that there was another occupant in the house. While attempting to locate the other occupant, investigators observed marijuana residue on the stand near the television. Investigators also observed a baggie with corners missing on the kitchen table. This is consistent with packaging of cocaine or cocaine base. **LAWSON** admitted to smoking marijuana in the house the previous night. Investigators also observed numerous small hand rolled cigars that may have been filled with marijuana throughout the house.

30. At approximately 6:00 a.m., on April 25, 2018, investigators attempted to make contact with **CREWS** at **TARGET LOCATION B** to serve the arrest warrant. Investigators did so by knocking and announcing their presence at the door at **TARGET LOCATION B.** Investigators loudly knocked and announced their presence several times. Investigators observed a light turn on in the house, but there was still no answer at the door. Approximately five minutes later **CREWS** answered the door. Upon making entry into the house, investigators detained **CREWS** in the doorway of the home. Investigators then heard movements and noise from other human occupants of the home. Investigators continued to sweep the home to detect any other possible individuals inside of **TARGET LOCATION B.** While sweeping **TARGET LOCATION B**, investigators observed several knotted plastic baggies on the island counter in the kitchen. These bags contained possible drug residue. Based on your training and experience, your affiant believes that these baggies would be consistent with packaging for distribution of cocaine and/or crack cocaine. In particular, the small knotted bags would be ideal for multiple street level distributions to customers. Investigators conducted a True Narc test on the residue on these bags

13

in the kitchen. True Narc is an advanced infrared preliminary field test. The True Narc test returned positive for cocaine base also known as crack cocaine.

31.     Also, while securing the home and searching for other occupants, investigators observed that the bathroom floor near the toilet was very wet. Additionally, investigators observed that there was splashed water all over the rim and seat of the toilet. Investigators also found numerous knotted bag corners in the waste basket next to the toilet. These bag corners would be consistent with street level cocaine and/or crack cocaine distribution. Investigators eventually discovered **CREWS'** wife and three children in different areas in the residence. Given that it took **CREWS** over five minutes to answer the door, the preliminary field test of the bags in the kitchen, and investigators' observations in the bathroom, your affiant believes that **CREWS** may have flushed drugs and/or drugs paraphernalia in anticipation of an arrest and/or search warrant. Your affiant knows from his training and experience that drug traffickers may attempt to destroy evidence in anticipation. **CREWS** has prior felony drug and firearms convictions.

Terrence R. Sweeney
Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me this
day 25th of April, 2018.

ROBERT C. MITCHELL
United States Magistrate Judge

# ATTACHMENT A

## DESCRIPTION OF THE PREMISES TO BE SEARCHED

**TARGET LOCATION A - 400 McKeen Avenue, Apt. 1 (side apt), Donora, PA 15033** – is a three story brown brick structure. Apt. 1 has a white door that is facing the street.

**TARGET LOCATION B - 815 Washington Avenue, Charleroi, PA 15022** – is a three story tan sided single family house. The numbers 815 are in black type face and affixed to the front door.

## **ATTACHMENT B**

PROPERTY TO BE SEARCHED AND SEIZED

Any and all evidence, instrumentalities, fruits, and contraband relating to violations of Title 21, United States Code, Sections 841 (a)(1), 843(b), and 846.

a. All controlled substances;

b. Drug packaging, paraphernalia and equipment, and quantities of residues of controlled substances, including methamphetamine, heroin, marijuana, cocaine fentanyl and the like;

c. Any cellular devices, iPads, computers, or other electronic devices capable of connecting to the internet.

d. Books, records and information, receipts, notes, ledgers, and/or papers relating to the mailing, transportation, ordering, purchasing, and/or distribution of controlled substances;

e. Books, records and information, receipts, bank statements and records, money drafts, letters of credit, money orders and/or cashier's checks, and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money made from engaging in illegal drug trafficking;

f. Financial proceeds of unlawful trafficking in controlled substances, including but not limited to, United States currency, financial instruments, precious metals, jewelry and/or other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or the spending of large sums of money made from illegal drug trafficking activities;

g. Photographs of persons suspected of unlawful drug trafficking, and of assets, and or controlled substances, and of drug paraphernalia associated with same;

h. Indicia of occupancy, residency, rental, usage and/or ownership of the premises described above, as well as the rental, usage and/or ownership of any vehicle engaged in the trafficking of controlled substances, including but not limited to, rental agreements, titles, telephone bills, utility bills, vehicle registrations, canceled envelopes, safety deposit box keys, safe keys, as well as keys to the actual residence and/or premises, and/or vehicles;

i. Records of telephone numbers, address books, or papers which reflect names, addresses and/or telephone numbers of associated and co-conspirators involved directly and indirectly in the trafficking of controlled substances, and/or associates who have a monetary consideration and/or interest in the illegal trafficking of controlled substances;

j. Any and all firearms possessed or utilized in the furtherance of the illegal acquisition, possession, sale, trade, distribution, storing, secreting, transfer, transportation, and/or illegal trafficking of drugs. And any and all firearms used or intended for use to facilitate a violation of Title 21, United States Code, Sections 841 and 846;

k. Mail matter (all classes), Priority Mail and Priority Mail Express parcels and packaging, FedEx and UPS parcels and packaging, and other correspondence which reflect names and addresses of suspected co-conspirators in the trafficking and mailing of drugs and cash proceeds.